IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 5, 2026 Session

## TERRA LYNN THOMPSON v. JUSTIN CLAUDE THOMPSON

**Appeal from the Circuit Court for Williamson County**
**No. 24-CV-21       Joseph A. Woodruff, Judge**

————————————————————————

### No. M2025-01226-COA-R3-CV

————————————————————————

Husband and Wife divorced.  In ruling upon contested matters, the trial court awarded Wife transitional alimony and alimony *in futuro* as well as attorney's fees.  Husband appealed. He argues the trial court's award of alimony was error because the court miscalculated his income, because it errantly excluded certain evidence, and because it awarded the wrong type of alimony.  He also argues that Wife's attorney's fees affidavit was insufficient to support an award of attorney's fees.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Perry A. Craft, Nashville, Tennessee, for the appellant, Justin Claude Thompson.

Jessica N. Borne and Aubrey M. Malchow, Franklin, Tennessee, for the appellee, Terra Lynn Thompson.

### OPINION

I.

After more than 16 years of marriage, Terra Thompson (Wife) filed for divorce from Justin Thompson (Husband).  At that time, their three minor children were ages 14, 12, and 10, respectively.  Wife spent the majority of the marriage caring for the children as a stay-at-home parent.  Husband had worked as a business manager for a masonry company for approximately eight years.  Although Wife found employment at two jobs around the time

the parties separated, Husband continued to earn a significantly higher income than Wife. Their differing financial outlooks presented a major source of discord during the divorce proceedings.

Husband's income, which consisted of a base salary plus an annual bonus calculated at the end of the year, had grown substantially in his eight years with the masonry company. He presented evidence that his base salary for the five years prior to Wife's divorce filing increased each year, growing from $97,040.80 to $137,379.51. He also presented evidence showing that his annual bonuses for those years were $80,000, $85,000, $95,000, $100,000, and $250,000, respectively. He reported the bonuses as part of his income on his tax returns.

For purposes of the divorce, however, Husband took the position that his annual bonuses should not be included in the calculation of his income. He did not produce documentary evidence of his compensation for 2024, the year Wife filed for divorce, and he testified at trial that he had not filed his taxes as of the usual deadline for that year. Unlike years past, Husband did not deposit his 2024 bonus into the parties' joint bank account. Instead, he placed the $250,000 bonus he received in a separate account and did not inform Wife of the amount until after she filed a motion to compel. He later admitted at trial that he would have to recognize this amount on his tax return for the year and testified that his total "income was just under $400,000" in 2024. However, he stated that he "never considered that [the bonus] was [Wife's] business" after she filed for divorce. He claimed that he did not "think [he] failed any disclosure" requirements and had not thought depositing the bonus into his separate account was "an issue." Husband argued that the court should find that his monthly gross income, for purposes of child support and alimony, was $12,000.58.

On the first day of the parties' divorce trial, Husband surprised Wife and her attorney by testifying that the ownership of his business had changed the week prior to trial and that he did not expect to get a bonus moving forward. He proffered as evidence of the change in ownership and new payment structure an unsigned letter that he described as "a proposed term sheet for [his] employment" with the company's purchaser. The letter, which was dated "April 11, 2025," the Friday before the trial, stated that Husband's employment with the purchaser was "contemplated to begin on or around April 11, 2025 (the 'Transaction Date')." It stated that Husband would receive an annual base salary of $150,000 and that, "[c]ommencing in the 2025 plan year, [Husband would] be eligible for a target bonus equal to 20% of [his] annual base compensation." According to the language in the letter itself, the letter constituted "a legally binding agreement between the parties hereto regarding the principal terms of [Husband's] employment, which will be evidenced by a definitive agreement to be entered on or before the Transaction Date." It also stated, however, "that if definitive agreements are not entered into between the parties, this Term Sheet shall continue in full force and effect." Neither of the letter's signature lines for Husband or for the company's purchaser were signed.

Wife's attorney objected to the letter as unauthenticated and hearsay; additionally, she argued that Husband had failed to supplement his discovery responses to include the letter or provide any hint that his pay structure may change. Wife's counsel noted for the court that Husband's response to Wife's interrogatory about his bonuses stated only that he "may receive a year end bonus determined by [the] company owner alone." Wife claimed to have received no information about any potential change in company ownership in discovery. Husband's attorney had supplemented discovery responses as recently as the night before the trial, but the unsigned letter was not included in that supplementation. Husband's attorney explained that he had seen the letter Husband was presenting for the first time on the morning of the trial.

The trial court excluded the letter from evidence and stated that it would give Husband's testimony about the alleged change in ownership and payment structure – to which Wife did not object – "what [the court] consider[ed] to be the weight that it deserves." Husband testified that the change in ownership was "in the early processes." He was still "unclear" about the name of the new business. Still, he testified that he had been offered employment at a base salary of $150,000 plus a potential bonus of up to 20% of his salary and that he understood this to be a "take it or leave it" offer. He conceded that he did not, at that time, have a contract of employment with the purchaser. According to Husband, he had not received the letter at issue until Monday, April 14, 2025, two days before the trial, and that, as of the Wednesday trial date, there had been no follow-up.

Husband also testified, however, that he "understood that [the company's owner and the purchaser] discussed opportunities" for a sale as early as "in the first quarter" of 2024. He stated that, around the time he received his 2024 bonus in December of that year, the company's owner had explained to him the possibility of a sale and change in bonus structure. Husband understood the deal to have closed on April 11, 2025. He asserted that he believed the business "was only entertaining ideas" until then and that he had only "learned the closing date probably within a few days before [April] 11th," when he "overheard discussions between [the company's] in-house accountant and the company owner . . . either early in the week last week or the week before that." The trial court determined that "Husband was certainly on inquiry notice to the very least as early as December of 2024 that the compensation information that he had disclosed in discovery needed to be supplemented," but he "did not supplement it" or "even inform his own attorney of this information."

After a delay, the trial continued approximately one month later. At the trial, Husband attempted to testify about the sale of the company and his expected 2025 income, but Wife's attorney objected. Wife's attorney still had not "received anything . . . to clarify what this business transaction is or if it's even officially occurred." The court reiterated that there had been "inadequate and insufficient compliance with [Husband's] discovery obligations" to the extent that Wife's counsel was "deprived of a reasonable opportunity to

- 3 -

corroborate what [Husband] claims to be the case [regarding] things that are not matters of his personal knowledge." Accordingly, the court ruled that the only evidence it would allow to be introduced on the issue at that time would be "a fully executed employment agreement provided that it ha[d] been timely disclosed to Wife's counsel before [the second day of trial]." Husband did not have a signed employment contract. He had not officially accepted the terms of the letter. Outside the presence of the trial judge, Husband made an offer of proof in which he testified that even though he had not signed a contract with the purchaser, he was the purchaser's employee. He described the letter as "a draft" that he had not been asked to sign as of that time, and he explained that he was unsure about his future with the company.

For her part, Wife testified that the bonus was contemplated prior to Husband's acceptance of the job and that the family had "relied heavily on that bonus," which they used "to help sustain [them] every year." She also testified that she had not been aware of any potential change in company ownership prior to Husband's testimony on the issue.

According to Wife, both parties had agreed that she would be a stay-at-home parent when they began having children. Although she also had a degree in business administration, she had worked for only a couple of years before that transition. She claimed that the most money she had earned annually before their first child was born was $21,691. She started seeking employment around the time she separated from Husband, but she felt that she was limited by her "lack of skill-set" because she "started being a stay-at-home mom so early."

At the time of trial, Wife was working two jobs: she earned $23,102.12 as a teacher's assistant during the school year and $17.17 per hour working part-time at Walgreens. She estimated that she worked at Walgreens 10 hours each week during the school year and that she worked more in the summer "whenever she could grab something extra." She testified that she had looked into going back to school to improve her skills, but she felt that she "couldn't commit financially yet" because the schools with which she had spoken had schedules that would prevent her from working. Additionally, during the summer break that took place while the divorce was pending, Wife had cared for the children during Husband's parenting time to accommodate his work schedule. She testified that this care was "fully on [her] dime, fully on his time every day . . . except one particular day of the whole summer." He "provided no help financially" with this. She alleged that this additional childcare impacted her ability to take on shifts at Walgreens, especially because the times Husband would pick up the children were inconsistent. She tried to take shifts on weekends and "every night that [she] could" after the children returned to Husband's care. Husband had already proposed using the same routine in the upcoming summer.

The parties' estimates of the expenses associated with the children's care varied significantly. Wife submitted a sworn, itemized income and expense statement in which she delineated $4,144.33 in monthly costs related to the children. By contrast, Husband

estimated approximately $1,607.66 in monthly costs for the children. Wife's residential rent payment for a home within the children's school district was also higher than the mortgage on the marital home. Husband testified that he did not keep track of expenses for the children "outside of child support." He believed that there were no regular costs for the children's medical care because of his insurance. He had never taken the children to their pediatricians. He pointed out that he had once "loaded up" the children's school lunch accounts several months prior "in excess of $180," though he "would have to find those receipts," and that he had once bought one of the children tickets to a school dance.

Husband and Wife agreed that Wife had requested reimbursement for certain bills related to the children's care and that Husband had never paid Wife any money in response to these requests. He had denied Wife's requests for out-of-pocket medical costs. He had told Wife that he was not going to contribute to the cost of braces for one of the children until after the divorce was finalized. He denied Wife's requests to pay for the children's counseling sessions. According to Wife, she had paid for all of these appointments "except for two" that Husband had attended. Husband responded with an estimate that he may have actually paid for "six or so" appointments "if [he] had to guess." He did not know how much the counseling cost. Wife also testified that she paid for the children's school activities, extracurriculars, and lunches. She testified that one of the children, who had a food allergy, complained that Husband did not provide her with enough safe food that she could eat. Husband did not "doubt that [Wife has] been paying" for these things for the children. Still, Husband complained that he was "at a major deficit where [he] had to contribute to [Wife's] monthly child support payments as well as paying her vehicle . . . as well as the insurance for that vehicle."

Following the end of the trial, Wife submitted an affidavit in support of her request for $58,122.50 in attorney's fees and an additional $1,437.10 in costs. Therein, Wife's lead attorney swore that her hourly rate was $375 per hour, that her associate's hourly rate was $250, that her paralegal's hourly rate was $150, and that the team had worked a total of 201.40 hours on Wife's case. Husband filed a response opposing the award. He complained that the affidavit was insufficient because "[t]here was no breakdown of the time spent on any activity or tasks and the expenses were not itemized," which he argued was "necessary for the Court and counsel to analyze the fee request." Husband did not request a hearing on the issue of attorney's fees nor did he file a motion seeking a more specific accounting from Wife's counsel or argue that the overall amount requested for attorney's fees was unreasonable.

The trial court entered a memorandum and order in which it divided the marital estate, set a parenting schedule and child support, and awarded alimony and attorney's fees. Relevant to these issues, the trial court found that Wife's testimony "was detailed, compelling, and highly credible," but that "Husband was not a credible witness." He "did not answer questions in a straightforward manner," he "employed strategic silence in a way that occasionally resulted in his testimony being less than the whole truth," his "testimony

was contradicted by other credible evidence," and some of his testimony "was directly impeached by the testimony of other witnesses," including that of his teenage child.

For purposes of child support and alimony, the trial court determined that Husband's income was variable and therefore found his average gross monthly income by averaging his income from the years 2019 through 2024. The trial court also found that, "[i]n the first quarter of 2025, Husband deposited an average of $22,786 per month in his checking account," which was "13% greater than his six-year average gross monthly income." The trial court, however, excluded this from the calculation of Husband's average gross monthly income on the basis that the variance was significant enough to render the amount not statistically reliable. Averaging the lower 2019 through 2024 totals, the trial court determined that "Husband's gross monthly income should be set at $20,083."[1] The trial court concluded that Husband's asserted gross monthly income of only $12,000.58 was, therefore, "unreasonably low."

Based on Wife's two jobs, the trial court determined that her average gross monthly earning potential was $2,949.[2] Using these numbers, the trial court determined that Husband's monthly child support obligation was $1,973. In analyzing Wife's alimony request pursuant to the statutory factors in Tennessee Code Annotated section 36-5-121(i), the trial court found that Wife was "not currently able to be completely self-supporting" but that "[n]early half of Wife's monthly economic need consists of expenses related to the children," which would "decrease as the children emancipate." The oldest child would emancipate in three years, and the youngest would emancipate in six years. The court also found that Wife's "need for alimony is an amount within Husband's ability to pay."

Thus, the trial court awarded Wife a combination of transitional alimony and alimony *in futuro*. The trial court ordered Husband to pay Wife transitional alimony of $6,000 per month for 36 months following entry of the order, then transitional alimony of $4,000 per month for the next 36 months, and thereafter alimony *in futuro* in the amount of $2,000 per month. In examining Wife's request for attorney's fees pursuant to the relevant factors, the court found that Wife's incurred fees and expenses of $59,559.60 were reasonable, that Husband's attorney's fees and expenses were not a part of the record, and

---

[1] Wife argues in support of the trial court's ruling and does not contest the number at which the trial court arrived.

[2] The trial court calculated this number based on Wife's annual gross compensation of $23,102.12 working as a teacher's assistant, her ability to work 10 hours per week at Walgreens during the 42 weeks of the school year, and her ability to work 30 hours per week at Walgreens during the 10 non-school weeks of the year. Although Wife had testified that she earned $17.17 per hour at Walgreens, the trial court calculated her income at Walgreens using $17.07. Using the $17.17 amount as to which Wife testified to calculate her gross monthly income potential results in $2,955.37. Husband has not raised as an issue any error in the calculation of Wife's earnings in this appeal.

that Husband's objections were without merit. The trial court awarded Wife a judgment for the attorney's fees in the amount of $59,559.60.

Husband appealed, challenging the trial court's award of alimony and attorney's fees. Regarding alimony, he contends the court erred in calculating his average gross monthly income, that the trial court erroneously excluded the unsigned letter from evidence, and that the court awarded alimony of the wrong type. As for the award of attorney's fees, Husband contends that the trial court erred in accepting an affidavit that did not include a breakdown of time spent on specific tasks related to the case.

II.

Following a bench trial, as here, we review the trial court's findings of fact "de novo upon the record with a presumption of correctness, 'unless the preponderance of the evidence is otherwise.'" *Mathes v. 99 Hermitage, LLC*, 696 S.W.3d 542, 552 (Tenn. 2024) (quoting *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017) (quoting Tenn. R. App. P. 13(d))). Review of a trial court's determinations on questions of law is "de novo with no presumption of correctness accorded to the rulings of the courts below." *McNabb v. Harrison*, 710 S.W.3d 653, 658 (Tenn. 2025); *Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011).

III.

We turn first to Husband's contention that the trial court overstated his gross monthly income by "wrongly including speculative and uncertain future bonuses" in the calculation of alimony.[3] Determining a party's income "is a question of fact that requires careful consideration of all the attendant circumstances." *Buntin v. Buntin*, 673 S.W.3d 593, 607 (Tenn. Ct. App. 2023) (quoting *Jekot v. Jekot*, 362 S.W.3d 76, 82 (Tenn. Ct. App. 2011)); *Robeson v. Robeson*, No. M2023-01449-COA-R3-CV, 2025 WL 368233, at *7 (Tenn. Ct. App. Feb. 3, 2025), *perm. app. denied* (Tenn. June 18, 2025). On appeal, we review findings of fact "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d).

Here, the trial court calculated Husband's gross monthly income pursuant to the Tennessee Child Support Guidelines. *See* Tenn. Comp. R. & Regs. 1240-02-04-.01 - .09. The Guidelines define a parent's gross income as inclusive of "all income from any source

---

[3] In his appellate brief, Husband explicitly states that he "is not contesting the child support payment" ordered by the trial court using the same calculation of his income. Accordingly, he has waived any issue relating to the calculation of his income for child support purposes. *See Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012); Tenn. R. App. P. 27. Thus, we consider Husband's challenge to the calculation of his income only insofar as it affects the award of alimony to Wife.

(before deductions for taxes . . .), whether earned or unearned," including both "[s]alaries" and "[b]onuses." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(1), -.04(3)(a)(1)(ii), -.04(3)(a)(1)(v). Similarly, Tennessee's spousal support statute requires courts to consider, in awarding alimony, "[t]he relative earning capacity . . . including income from pension, profit sharing or retirement plans and all other sources." Tenn. Code Ann. § 36-5-121(i)(1); *see Robeson*, 2025 WL 368233, at *7. The determination of a spouse's earning capacity "requires consideration of the party's circumstances and qualifications, including their age, past and present employment, education and training, and ability to work." *Blount v. Blount*, 720 S.W.3d 295, 335 (Tenn. Ct. App. 2024), *perm. app. denied* (Tenn. Mar. 13, 2025)(quoting *Levy v. Levy*, No. W2023-01124-COA-R3-CV, 2024 WL 3747842, at *5 (Tenn. Ct. App. Aug. 12, 2024)).

Under the Guidelines, "bonuses" are considered "[v]ariable income," which "shall be averaged over a reasonable period of time consistent with the circumstances of the case and added to a parent's fixed salary or wages to determine gross income." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(b); *Marcel v. Marcel*, No. M2021-00594-COA-R3-CV, 2022 WL 17335655, at *5 (Tenn. Ct. App. Nov. 30, 2022).[4] Trial courts have discretion, based on the particular facts of a case, to determine the most appropriate way to average variable income. *Blount*, 720 S.W.3d at 337 (citing *Jensen v. Jensen*, No. E2023-00315-COA-R3-CV, 2024 WL 4032972, at *23 (Tenn. Ct. App. Sept. 4, 2024)); *Hanselman v. Hanselman*, No. M1998-00919-COA-R3-CV, 2001 WL 252792, at *3 (Tenn. Ct. App. Mar. 15, 2001) ("The guidelines themselves do not prescribe how variable income should be averaged."). Tennessee courts have tended toward "a preference for long-term averaging as the most appropriate method for calculating income that is variable in nature." *Marcel*, 2022 WL 17335655, at *5 (quoting *Burnett v. Burnett*, No. W2007-00038-COA-R3-CV, 2008 WL 727579, at *11 (Tenn. Ct. App. Mar. 19, 2008)). This Court has regularly upheld averages calculated over the course of years. *Hayes v. Hayes*, No. M2014-00237-COA-R3-CV, 2015 WL 1450998, at *4 (Tenn. Ct. App. Mar. 26, 2015) (collecting cases). Such averaging may even, at times, result in a finding that a parent's average monthly income is slightly greater than the amount that the parent is earning at the time of trial. *See, e.g., Buntin*, 673 S.W.3d at 607. Here, Husband's income actually appeared to be increasing and was higher at the time of trial.

---

[4] Husband's reliance upon *Velez v. Velez* to suggest his bonuses should not have been considered is misplaced. No. M2011-01949-COA-R3-CV, 2012 WL 3104922 (Tenn. Ct. App. July 31, 2012). The evidence in that case showed that the husband earned a regular salary of $70,000 per year and had received three different bonuses within that employment: a $2,500 signing bonus, a $500 fourth-quarter bonus, and a $1,000 bonus. *Id.* at *1. This Court found "no error with the trial court's conclusion that [his] bonuses, *at this time*, are too speculative for inclusion as income." *Id.* at *4 (emphasis added). Contrary to the present case, where Husband's bonuses were paid regularly as part of his work, the husband in *Velez* had received bonuses that were not regularly paid. *Id.* Moreover, the *Velez* trial court did not discount the possibility that the bonuses may become relevant to the calculation of the husband's income in the future; accordingly, it ordered that he should immediately notify the wife of any bonuses he received going forward.

In the present case, the trial court averaged Husband's salary and annual bonuses over a span of the six most recent years to determine his average gross monthly income. It used evidence submitted by and testimony of Husband regarding his past salary and bonuses as the source of the numbers used for this calculation. That evidence showed Husband's base salary increasing each year and his bonus either increasing or remaining the same. The trial court determined based upon its averaging that Husband's gross monthly income should be set at $20,083.

Husband argues on appeal, however, that the trial court should have found his monthly income to be $12,500, based largely on the contents of the letter that was excluded from evidence. He asserts that the trial court should have admitted the letter and any testimony about its contents on the basis that he received the letter only shortly before the first day of trial and that Wife was aware of the letter's existence by the second day of trial.

"[T]he admissibility of evidence is within the sound discretion of the trial court, and its decision to admit or exclude evidence is overturned on appeal only when there is an abuse of discretion." *Crotty v. Flora*, 676 S.W.3d 589, 607 (Tenn. 2023). "An abuse of discretion occurs when the trial court applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *West v. Schofield*, 460 S.W.3d 113, 120 (Tenn. 2015).

The record reflects that the trial court excluded the letter from evidence on three bases: that Husband's failure to supplement his discovery responses with the information therein was effectively "knowing concealment" of the information, that the letter lacked reliable authentication, and that the contents of the letter were hearsay. *See* Tenn. R. Civ. P. 26.05(2) ("A party is under a duty seasonably to amend a prior [discovery] response if the party obtains information upon the basis of which the party . . . knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment."); Tenn. R. Evid. 901 (describing authentication as "a condition precedent to admissibility [that] is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims"); Tenn. R. Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").

Upon thorough review of the record, we conclude that the trial court did not abuse its discretion in excluding the letter from evidence. The trial court found that Husband had notice that the information he provided in discovery about his income needed to be supplemented as of, at the latest, December 2024 based on Husband's testimony that the company's owner had explained to him the possibility of an upcoming sale of the business and change in bonus structure at that time. Despite this knowledge, Husband did not supplement his discovery responses to include this information before the day of trial, nor

did he supplement the responses in the intervening month prior to the second day of trial to provide additional information regarding this matter. *See* Tenn. R. Civ. P. 37.03(1) ("A party who without substantial justification fails to supplement or amend responses to discovery requests as required by Rule 26.05 is not permitted, unless such failure is harmless, to use as evidence at trial . . . any witness or information not so disclosed"). Furthermore, as to testimony regarding this matter, the record shows that Husband testified on the first day as to the alleged employment offer and that the trial court determined that it would give Husband's testimony on the matter "the weight that it deserves." *See Tennessee Homes v. Welch,* 664 S.W.3d 1, 8 (Tenn. Ct. App. 2022) (stating that "great weight is given to the trial court's determinations of credibility").

Having concluded that the trial court did not abuse its discretion in excluding the letter due to Husband's failure to supplement discovery regarding this matter, we need not analyze the trial court's other bases for excluding the letter. We therefore affirm the trial court's findings regarding Husband's income for purposes of alimony.

IV.

Husband also contends that the trial court erred in awarding Wife excessive alimony and alimony of an improper type. It is well established in Tennessee law that a trial court's decision regarding spousal support is factually driven, so we are "disinclined to second-guess a trial judge's spousal support decision" absent an abuse of discretion. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011) (quoting *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). As the Tennessee Supreme Court has explained,

> An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Gonsewski*, 350 S.W.3d at 105-06.

Tennessee recognizes four types of spousal support: rehabilitative alimony, alimony *in futuro*, transitional alimony, and alimony *in solido*. Tenn. Code Ann. § 36-5-121(d)(1). Rehabilitative alimony is preferred wherever circumstances are such that it may permit the economically disadvantaged spouse

> to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

Tenn. Code Ann. § 36-5-121(d)(2). Rehabilitative alimony "serves the purpose of assisting the disadvantaged spouse in obtaining additional education, job skills, or training, as a way of becoming more self-sufficient following the divorce." *Gonsewski*, 350 S.W.3d at 108. By contrast, transitional alimony is appropriate "when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce." Tenn. Code Ann. § 36-5-121(d)(4); *Mayfield v. Mayfield*, 395 S.W.3d 108, 115 (Tenn. 2012) (describing transitional alimony as "a form of short-term 'bridge-the-gap' support designed to 'smooth the transition of a spouse from married to single life.'"). Alternatively, alimony *in futuro* is "a payment of support and maintenance on a long term basis or until death or remarriage of the recipient." Tenn. Code Ann. § 36-5-121(f)(1). Such long-term alimony is appropriate where "the court finds that there is relative economic disadvantage and that rehabilitation is not feasible, meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties." *Id.*

Courts consider the following factors in determining whether to award alimony, the appropriate type of alimony, and the amount of alimony:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

- 11 -

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i). Of these factors, "[t]he two most important factors considered are the need of the disadvantaged spouse and the obligor spouse's ability to pay." *Bratton v. Bratton*, 136 S.W.3d 595, 604 (Tenn. 2004); *Gonsewski*, 350 S.W.3d at 110.

The trial court made extensive findings regarding the statutory factors. Among these findings, the court found that the parties had drastically different capacities to earn income. *See* Tenn. Code Ann. § 36-5-121(i)(1). Husband had been continuously employed throughout the marriage, whereas Wife had been "out of the work force for more than a decade." Even though both parties had college degrees, Wife was less employable because she lacked "on-the-job experience during a time when technology has been rapidly evolving." Furthermore, Husband "would not have been able to devote as much time to his career as he ha[d] done if it were not for Wife's devotion to the demands of domestic

family life." Furthermore, Wife had "demonstrated a commendable work ethic," working at two jobs during the pendency of the divorce.

Wife had estimated significantly more post-divorce expenses than Husband, "primarily due to the difference in [their] estimates regarding housing and childcare" expenses. Wife's estimated needs resulted in a significant monthly deficit, whereas Husband's average gross income resulted in a surplus. Because so much of Wife's estimated deficit arose from the costs of care for the parties' three children, the court determined that her expenses would decrease as the children emancipated. The evidence does not preponderate against these findings.

Based on the parties' circumstances and the findings regarding the statutory factors, the trial court determined that a combination of transitional alimony and alimony *in futuro* was most appropriate. The court tied this award to the emancipation of the children: Wife would receive $6,000 per month in transitional alimony until the emancipation of the oldest child, $4,000 per month in transitional alimony until emancipation of the youngest child, and thereafter $2,000 in alimony *in futuro*. The court applied the correct legal standards, based its decision on a careful assessment of the evidence, reached a logical conclusion in making this award, and has done no injustice to Husband. *See West*, 460 S.W.3d at 120. Accordingly, we affirm the trial court's award of transitional alimony and alimony *in futuro* in the amounts set by the trial court.

V.

Husband also argues that the trial court erred by awarding Wife attorney's fees. "[A]n award of attorney's fees in a divorce case constitutes alimony in solido." *Gonsewski*, 350 S.W.3d at 113. The purpose of alimony *in solido*, also known as lump sum alimony, "is to provide financial support to a spouse, to enable the court to equitably divide and distribute marital property, or both." Tenn. Code Ann. § 36-5-121(h)(1)(A). We review the trial court's decision concerning attorney's fees in a divorce for an abuse of discretion. *Rowe v. Rowe*, No. M2024-00114-COA-R3-CV, 2025 WL 1483681, at *7 (Tenn. Ct. App. May 23, 2025) (citing *Gonsewski*, 350 S.W.3d at 113); *see West*, 460 S.W.3d at 120 ("An abuse of discretion occurs when the trial court applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party.").

The trial court awarded Wife attorney's fees in the amount of $59,559.60 based on its analysis of Wife's *Affidavit of Attorney's Fees* and the relevant statutory factors. *See* Tenn. Code Ann. § 36-4-121(i)(2). In its analysis, the trial court noted that, following the filing of Wife's attorney's fee affidavit, Husband filed a response in opposition. Therein Husband argued that Wife's affidavit was insufficient to support an award of attorney's fees because it provided only general information regarding the total hours that all people at Wife's attorney's firm worked on the case; the various hourly rates for work performed

- 13 -

by the lead attorney, associate attorney, and paralegal; and the total fees and costs requested. Husband complained that the court should "substantially reduce . . . or disallow any attorney fee award" because the affidavit failed to provide a breakdown of the tasks performed, time spent on each task, and who performed each task.

Husband did not request a hearing regarding the award of attorney's fees. Husband instead submitted an objection, asking the trial court to "substantially reduce the request for attorney's fees sought by Wife or disallow any attorney fee award," because of alleged deficiencies in the attorney's affidavit insofar as it failed provide specificity as to how time was expended in representing Wife. Husband did not dispute the overall reasonableness of the attorney's fees requested by Wife. There is no indication that Husband sought from Wife a more detailed breakdown of information regarding the specific activities associated with the overall fee award. He also filed no motion seeking such information. To the contrary, Husband endeavored to use this deficiency as a basis for substantial reduction or total disallowance of attorney's fees.

The trial court explained its reasoning as to attorney's fees award as follows:

Allocating responsibility for the payment of marital debt is determined by examining four factors: (A) The purpose of the debt; (B) Which party incurred the debt; (C) Which party benefitted from incurring the debt; and (D) Which party is best able to repay the debt. Tenn. Code Ann. § 36-4-121(i)(1)(A-D). The allocation of responsibility for attorney fees in connection with a divorce case requires the analysis of the previous four factors, as well as four additional factors:

(A) The total amount of attorney fees and expenses incurred by each party in connection with the proceedings;

(B) The total amount of attorney fees and expenses paid by each party in connection with the proceedings;

(C) Whether the attorney fees and expenses incurred by each party are reasonable under the factors set forth in Rule 1.5 of the Tennessee Rules of Professional Conduct; and

(D) Whether the attorney fees and expenses were necessary.

Tenn. Code Ann. § 36-4-121(i)(2)(A-D).

Wife incurred $59,559.60 of attorney fees and expenses in connection with this case; Husband's attorney fees are *de hors* the record. The amount of attorney fees paid by both parties is also *de hors* the record.

Regarding Wife's attorney fees, the fees were incurred for the purpose of obtaining a divorce from Husband. Wife incurred this debt and is the primary beneficiary of this debt, but Husband is in the far better position to repay this debt; as discussed *supra*, Husband's income and potential earning far outweighs Wife's.

Regarding the factors in [Tennessee Rule of Professional Conduct] 1.5(a), Wife's counsel, Jessica Borne, has been licensed in Tennessee since 2011. During that time, she has practiced law continuously, first as a prosecutor with the State of Tennessee Office of the District Attorney General, and now in private practice. Ms. Borne enjoys an excellent reputation in the local legal community.

Ms. Borne charged an hourly rate of $375 per hour, and although her rate increased, she kept the same rate for Wife in this matter. Her associate charged a rate of $250 per hour, and her paralegal charged a rate of $150 per hour. All of these rates are within the range of rates charged in the 21st Judicial District for domestic litigation.

Ms. Borne has a written fee agreement with Wife. Altogether, Ms. Borne, along with her associate and paralegal, billed a total of 201.4 hours for this matter. Ms. Borne and her team spent a considerable amount of time and resources on this case. The time and effort expanded [sic] on this case precluded Ms. Borne from working on other cases. Wife prevailed at trial, and the Court is entering a [permanent parenting plan] that provides her with the majority of the parenting time, ordering Husband to pay her child support, and awarding her transitional alimony and alimony *in futuro*.

Husband objects to awarding the Wife her attorney fees. Husband argues that Wife's attorney's affidavit did not provide a breakdown of the task or activity performed, the time spent on the activity, stating the day the task was performed, and identifying which lawyer, or paralegal, performed each task. Husband also objects to Wife using two lawyers at trial.

The Court finds these objections are not well taken. The total number of hours worked by Ms. Borne, her associate, and her paralegal are in Ms. Borne's affidavit. It is of no consequence that Ms. Borne did not separately divide who worked on each task; this is not required by Tenn. Code Ann. § 36-4-121(i), nor is this required by RPC 1.5. Moreover, Husband's objection to Wife having multiple attorneys at trial is also without merit. Husband has cited no authority to say that Wife is not allowed to use multiple lawyers at trial. In any event, the fees must be reasonable in the aggregate, and the Court finds that they indeed are.

Trial Court Memorandum and Order (footnotes omitted).

On appeal before this court, Husband argues that the trial court abused its discretion. He contends that the failure of Wife's counsel to include records reflecting how time was expended in representing Wife with the attorney's fee affidavit means a trial court may not award attorney's fees. In support of this proposition, Husband references requirements from the Tennessee Administrative Office of Courts regarding payment for indigent representation and federal precedent that requires time entries.

We do not doubt that there are advantages for determining an appropriate award of attorney's fees that may arise from providing greater specificity with regard to how time was allocated in representing a client so that a trial court may be better positioned to consider an award of attorney's fees in a divorce proceeding. The absence of such information may impact a trial court's decision as to an attorney fee award. We also recognize that Father's strategy in this case has been to attempt to entirely disallow Mother's attorney's fees or at least substantially reduce them rather than more meaningfully addressing his purported concern – lack of sufficient information to be able to assess whether the fees are reasonable. If Father believed that he lacked adequate information from the affidavit provided, he could have asked for a hearing, which he did not, or could have sought more detailed information, which he did not.

Father has offered no Tennessee authority supporting a finding of abuse of discretion for awarding attorney's fees despite the absence of more detailed time entries and certainly no authority finding an abuse of discretion under circumstances such as the present case in which the trial court offered a thoughtful explanation of its attorney fee award. Problematic for Father, this court in a published opinion has rejected the argument that Father is advancing in this case. Confronting similar attorney's fees affidavits, this court concluded that "the deficiency in the proof for lack of adequate description of the services provided, standing alone, is not an adequate basis on which to find that a trial court abused its discretion in awarding the fees claimed." *Chaffin v. Ellis*, 211 S.W.3d 264, 291 (Tenn. Ct. App. 2006). This court has also observed that "in general, a court with knowledge of the subject proceedings and the extent of services required by the attorneys involved is in a position to determine the purpose and reasonableness of the attorney's fees requested." *In re Conservatorship of Hudson*, 578 S.W.3d 896, 910 (Tenn. Ct. App. 2018). Where a party believes that there is not adequate development as to the nature of the services rendered so as to be able address the reasonableness of an attorney fee award, this court indicated that the objecting party bears a burden to request a hearing on the reasonableness of the fees and to seek additional information. *Madden Phillips Const., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 830-31 & n.15 (Tenn. Ct. App. 2009).

The trial court clearly delineated its reasoning as to why it found the award appropriate, relying upon information that was in the affidavit and its own observations of

the proceedings.  Accordingly, based upon the argument presented and the record before us, in the present case, we find no abuse of discretion by the trial court with regard to the attorney's fee award.

VI.

For the aforementioned reasons, we affirm the judgment of the Circuit Court for Williamson County.  Costs of this appeal are taxed to the appellant, Justin Thompson, for which execution may issue if necessary.  The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

`                     s/ Jeffrey Usman
                      JEFFREY USMAN, JUDGE